DAUGHTREY, J., delivered the opinion of the court in which MERRITT, J., joined and GRIFFIN, J., joined in the result. GRIFFIN, J. (pp. 349-54), delivered a separate opinion concurring in the judgment.
OPINION
MARTHA CRAIG DAUGHTREY, Circuit Judge.
Plaintiff Angelo Binno is a legally blind individual who applied for admission to several law schools, unsuccessfully, and thereafter filed an action against the American Bar Association (ABA), under the Americans with Disabilities Act (ADA), claiming that his lack of success was due to a discriminatory admissions test “mandated” by the ABA. The admissions examination in question, utilized by nearly all law schools in the United States, is the Law School Admissions Test (LSAT). Binno contends that the questions on the LSAT have a discriminatory effect on the blind and visually impaired because a quarter of those questions “require spatial reasoning and visual diagramming for successful completion.” He alleges that his poor performance on the LSAT has prevented him from being admitted to accredited law schools, in violation of Titles III and V of the ADA. The district court granted the ABA’s motion to dismiss, finding that plaintiff Binno lacked standing to sue the ABA and, alternatively, that his amended complaint failed to state a claim for relief under either Title III or Title V of the ADA as a matter of law. We affirm, concluding that Binno does not have standing to sue the ABA because his injury was not caused by the ABA and because it is un *342 likely that his injury would be redressed-by a favorable decision against the ABA. Moreover, even if Binno could establish standing, the district court correctly dismissed his Title III and Title V claims for failure to state claims for which relief may be granted.
I. FACTUAL AND PROCEDURAL BACKGROUND
Defendant ABA is a voluntary professional organization that, among other things, is certified by the federal Department of Education as the national legal-education accreditation agency in the United States.[1] A majority of state high courts rely on the ABA’s approval of a law school to determine whether that state’s legal-education requirement for admission to the bar is satisfied. The ABA promulgates standards that are. binding on law schools in order to gain and maintain accreditation. Noncompliance with the ABA Standards may result in sanctions, including loss of a law school’s ABA-accreditation status. Relevant to this litigation, ABA Standard 503 provides, in relevant part, “A law school shall require each applicant for admission as a first-year J.D. degree student to take a valid and reliable admission test to assist the school and the applicant in assessing the applicant’s capability of satisfactorily completing the school’s program of legal admission.”
In their admissions process, most American law schools utilize the LSAT as an admissions test, which is the only one that the ABA presumes to be “valid and reliable” under its interpretation of Standard 503.[2] The LSAT currently has sections that test analytical reasoning, reading comprehension, and logical reasoning, and it requires a writing sample. The questions in the analytical-reasoning section also are known as “logic games,” which, according to Binno’s complaint, “require spatial reasoning and diagramming of visual concepts.”[3] Binno alleges that because he is *343 blind, he is “incapable of perceiving spatial relationships or performing the necessary diagramming to successfully complete the logic-games questions on the LSAT at a competitive level.” He alleges that the analytical-reasoning section thus caused him “substantial embarrassment, emotional distress, and mental anguish during the exam,” which negatively impacted his overall performance on the exam. By “offering” such a discriminatory admissions test, Bin-no, alleges, the ABA has caused “significant injury and irreparable harm to the Plaintiff, and others with disabilities, in violation of the ADA.
The ABA responds that although it accepts the LSAT as “valid and reliable,” the test is not an ABA product. Instead, the LSAT is written, administered, and scored by the Law School Admission Council (LSAC), an entity that is not part of the ABA. The LSAC provides accommodations for persons with disabilities who wish to take the LSAT. These accommodations include, but are not limited to, additional time to complete the test and the use of a reader during the examination. ABA Interpretation 503-1 allows a law school to “use[ ] an admission exam other than the [LSAT]” but requires the school to establish that the other test is “valid and reliable.” ABA Interpretation 503-2 provides that Standard 503 “does not prescribe the particular weight that a law school should give to an applicant’s admission test score in deciding whether to admit or deny admission to the applicant.”[4]
Without relevant documentation, but nevertheless convinced that he had been denied admission to three law schools in Michigan because of poor LSAT scores that were the result of discriminatory testing, Binno sued the ABA, alleging violation of Section 309 of the ADA’s Title III, 42 U.S.C. § 12189, and Section 503 of Title V, 42 U.S.C. § 12203(b). In his amended complaint, Binno claimed that the ABA “has ‘offered’ and continues to ‘offer’ a discriminatory examination” in violation of Title III of the ADA. In the alternative, Binno alleged that ABA Standard 503 “interferes” with his ADA rights in violation of Title V of the ADA. Binno requested only equitable relief: (1) a declaration that the ABA has violated Binno’s rights under the ADA; (2) an injunction preventing the ABA from accrediting law schools until the ABA “ceases it's implementation of Standard 503”; (3) an injunction preventing the ABA from applying Standard 503 to Binno and other legally blind or visually impaired individuals; and (4) an injunction “restraining the [ABA] from discriminating against individuals with disabilities” and requiring that the ABA “provide individuals with disabilities with full and equal access to the programs and services” of law schools.
The ABA moved to dismiss Binno’s complaint or, alternatively, for summary judgment. The district court judge granted the ABA’s motion to dismiss, holding that Bin-no had sued the wrong party, that he lacked standing to bring his action, and that if he did have standing, Binno failed *344 to state claims for relief under Title III and Title V of the ADA. Binno now appeals, challenging those determinations.
II. DISCUSSION
A. Standing
Binno argues that the district court erred in dismissing his case for lack of standing under Article III of the United States Constitution. Standing is, of course, a threshold requirement for federal jurisdiction. If a party does not have standing to bring an action, then the court has no authority to hear the matter and must dismiss the case. Imhoff Inv., L.L.C. v. Alfoccino, Inc., 192, F.3d 627, 631 (6th Cir. 2015). To establish Article III standing, the plaintiff must allege that: (1) he has suffered an injury-in-fact that is both “(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical”; (2) the injury is fairly traceable to the defendant’s conduct; and (3) it is likely that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Coyne v. Am. Tobacco Co., 183 F.3d 488, 494 (6th Cir. 1999). In the case of a plaintiff seeking equitable relief, as Binno does here, the claimant must allege “actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.” Daubenmire v. City of Columbus, 507 F.3d 383, 388 (6th Cir. 2007) (internal quotation marks and citation omitted). “The party seeking to invoke federal jurisdiction bears the burden to demonstrate standing and he ‘must plead its components with specificity.’ ” Id. (quoting Coyne, 183 F.3d at 494).
We review de novo a district court’s determination of Article III standing. Murray v. U.S. Dep’t of Treasury, 681 F.3d 744, 748 (6th Cir. 2012). In reviewing a challenge to standing, we may consider the complaint and any accompanying materials. Id. In evaluating a motion to dismiss, “both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.” Warth, 422 U.S. at 501, 95 S.Ct. 2197.
1. Injury-In-Fact
To establish Article III standing, a plaintiff first must demonstrate that he has suffered an injury-in-fact that is both “concrete and particularized” and “actual or imminent,” Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130, based on facts that are both “specific” and “concrete.” Warth, 422 U.S. at 508, 95 S.Ct. 2197. Conclusory allegations do not satisfy the requirements of Article III. See id.
In terms of injury, Binno alleges that he is “forced to take an examination [that] discriminates against blind and visually impaired persons” because it includes analytical questions that he cannot answer competitively, i.e., on equal footing with other law school applicants, which in turn causes him emotional distress that affects his performance on the rest of the test. Because the ABA does not appear to contest that Binno has a legally cognizable injury-in-fact, we move on to consider the remaining two standing factors, the existence of which the ABA does dispute.
2. Causation
To establish Article III standing, Binno also must demonstrate a causal connection between his injury and the defendant’s conduct. Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130. Binno argues that his injury is fairly traceable to the actions of the ABA because ABA Standard 503 effectively compels law schools to require the LSAT. In response, the ABA argues that because it is neither responsible for the *345 content of the LSAT nor for law schools’ use of the LSAT in law school admissions, Binno’s injury is not caused by the ABA’s actions. The district court found that Binno did not establish causation because the “facts set forth in the Amended Complaint allege that Binno’s injuries are from the questions posed on the LSAT, not [from] the ABA Standard 503.” We agree with this assessment.
Binno contends that his injury is traceable to the ABA because ABA Standard 503 compels law schools to require the LSAT in law school admissions. However, this argument is not supported by the récord, including allegations in the amended complaint. Under Standard 503, a “valid and reliable” admission test must be taken by all law school applicants as a requirement for a school’s accreditation, and in Interpretation 503-1, the ABA does accord the LSAT presumptive validity. But that policy explicitly allows law schools to use an admission exam other than the LSAT and, most significant in terms of Binno’s plight, Interpretation 503-2 provides that the weight given an individual applicant’s exam score is to be determined at the discretion of the law school. It is thus clear that the ABA does not actually “mandate” use of the LSAT and, moreover, nothing in the standards gives the ABA authority to prescribe its content. In that sense, the district court correctly noted that Binno had sued the wrong party. The law schools to which he applied, not the ABA, determine what weight, if any, to give Binno’s LSAT score, and the entity in control of the LSAT’s content and format is not the ABA but the LSAC. As the district court found, “There are no allegations that the ABA, itself, directed these questions to be included on the LSAT.”
3. Redressability
The third prong of an Article III standing analysis considers whether it is likely that the plaintiffs injury will be redressed by a favorable decision. Lujan, 504 U.S. at 560, 112 S.Ct. 2130. Binno fails to establish redressability for many of the same reasons that he cannot demonstrate causation. Even if we were to grant Bin-no’s requested relief by somehow making Standard 503 optional, law schools still could choose to require the LSAT in their admissions process. Because Binno’s relief depends on action by the law schools— third parties that are not before the court — a favorable decision by this court is not likely to redress Binno’s injury. See id.
Thus, even if we accept the unchallenged proposition that Binno has demonstrated injury-in-fact, we nevertheless must conclude that he has failed to establish the required causation and redressability that would support his standing to bring this action against the ABA. Moreover, even if we could find that Binno has standing, our review of the statutory bases he proposes would lead us to affirm the district court’s decision to dismiss.
B. The ADA Claims
1. Title III
To survive a motion to dismiss, a plaintiff must allege facts with sufficient specificity to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plausibility standard “asks for more than a sheer possibility that a defendant has acted unlawfully,” id. and instead “calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct].” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Under the standard set out in Iqbal and Twombly, a court accepts as true all factual allegations, but the court does not apply this presumption of truth to *346 conclusory or legal assertions. Iqbal, 556 U.S. at 678-79, 129 S.Ct. 1937. If the plaintiffs facts, accepted as true, do not state a claim that has facial plausibility, the plaintiff has not satisfied the pleading requirements under Rule 8, and the complaint will be dismissed. We review the district court’s ruling on a motion to dismiss de novo. In re NM Holdings Co., 622 F.3d 613, 618 (6th Cir. 2010).
Here, Binno first argues that the district court incorrectly dismissed his claim brought pursuant to the provisions of Title III of the ADA. Title III requires a private entity that “offers” admissions examinations to provide such examinations “in a place and manner accessible to persons with disabilities” or to offer alternative accommodations for such persons. 42 U.S.C. § 12189.[5] Binno contends that, consistent with the remedial purpose of the ADA, the term “offer” should be interpreted broadly to mean that the ABA “offers” the LSAT, because pursuant to accreditation Standard 503, the ABA “fully reviews, verifies, and mandates the LSAT” in law school admissions. In response, the ABA points out that the it cannot be said to offer the LSAT because it does not make the examination available to test-takers, nor does it exert any control over the “place and manner” of the test’s administration. The district court found that because Binno had not pleaded facts to indicate that the ABA administered, developed, or controlled the format of the LSAT, he had failed to state a claim under Title III of the ADA.
In interpreting a statute, we begin with its text. BedRoc Ltd. v. United States, 541 U.S. 176, 183, 124 S.Ct. 1587,
158 L.Ed.2d 338 (2004) (“[0]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.”). If a term in a statute is undefined, it is interpreted using its ordinary meaning. F.D.I.C. v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). If a term is used multiple times in the same statute, we presume that it has the same meaning wherever it is used in the statute. Util. Air Regulatory Grp. v. E.P.A., — U.S. -, 134 S.Ct. 2427, 2441, 189 L.Ed.2d 372 (2014) (“One ordinarily assumes that identical words used in different parts of the same act are intended to have the same meaning.”) (internal citation and quotation marks omitted). “Analysis of the statutory text, aided by established principles of interpretation, controls.” POM Wonderful LLC v. Coca-Cola Co., — U.S. -, 134 S.Ct. 2228, 2236, 189 L.Ed.2d 141 (2014).
The term “offer” is not defined in Section 309, nor is it defined elsewhere in the ADA. However, the term is used three times within Section 309: “Any [private entity] that offers examinations ... shall offer such examinations or courses in a place- and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.” 42 U.S.C. § 12189 (emphasis added). The context indicates that an entity that “offers examinations” under this provision must be able to provide an accessible “place and manner” for administration of the tests, or arrange for alternative, accessible accommodations.
The regulations that implement Section 309 discuss the administration of the exam and, accordingly, support the interpreta *347 tion that an entity offering the exam must have significant control over its administration or accommodation.[6] Binno argues that because the word “selected” is used within the implementing regulations,[7] an entity that “selects” the exam also “offers” it. However, in doing so, he ignores the fact that the term “selects” refers only to entities that “offer” an examination under Section 309.
Binno also insists that an entity that “reviews, verifies, and mandates the LSAT” must be held to offer the exam for the purposes of Section 309, but this argument is not supported by either the text of the statute or the cases interpreting the statute. Even if we construe it broadly because of the remedial nature of the statute at issue, see, e.g., Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the term “offer” nevertheless must be interpreted so that Section 309 is not meaningless. Because the statute states that an entity that “offers” exams must do so “in a place and manner accessible” to disabled persons or else offer alternative accommodations, the entity must have some ability to grant those accommodations in the administration of the exam. An entity without the authority to grant such accommodations would not be able to effectuate the purpose of Section 309.[8]
Indeed, Binno apparently concedes that the ABA is subject to Section 309 only “to the extent that [the ABA] exercises control over the manner in which the examination is given,” but he then fails to allege the manner in which that control is actually exercised by the ABA. Binno cites Bonnette v. D.C. Court of Appeals, 796 F.Supp.2d 164 (D.D.C. 2011), and Elder v. Nat’l Conference of Bar Exam’rs, C-11-00199-SI, 2011 WL 672662 (N.D. Cal. Feb. 16, 2011), to argue that Title III claims may be asserted against entities that do not administer an exam. However, in both these cases, defendant National Conference of Bar Examiners developed the content and format of the examination in question and had the actual ability to influ *348 ence the manner and administration of the exam.
In sum, Binno has not pleaded any facts in his complaint that demonstrate that Standard 503 gives the ABA authority over the manner and administration of the LSAT. Nor has he pleaded any facts that show that the ABA has authority to grant accommodations or make other arrangements in connection with the exam. Indeed, Binno undoubtedly cannot plead such facts, because it is the LSAC, and not the ABA, that develops and administers the LSAT and grants accommodations in the testing format. Because Binno has not pleaded facts to support a facially plausible claim, his Title III claim against the ABA fails as a matter of law.
2. Title V
Binno next argues that the district court erred in dismissing his claim brought pursuant to Title V of the ADA, which prohibits, among other things, “interference” with rights granted or protected under Title III.[9] He alleges that the ABA violated Title V of the ADA because Standard 503 “interferes” with Binno’s right to take an exam that is accessible to him or otherwise accommodates his disability. The district court dismissed that claim outright, reasoning that because Binno had failed to allege a violation of his rights under Title III of the ADA, he could not claim interference with the exercise of those rights under Title V of the ADA. Athough that logic is superficially appealing, we can envision, at least hypothetically, that there could be interference with the rights of a disabled individual by a third party. However, to plead a Title V violation successfully, Binno would have to allege facts to demonstrate that the ABA had interfered with the offering of the LSAT, i.e., the administration of the test in a place and manner accessible to persons with disabilities or the provision of alternative accessible arrangements. We already have held that Standard 503 does not violate Title III, and the allegations in Binno’s complaint are not sufficient to establish a claim of interference under Title V.
III. CONCLUSION
For the reasons set out above, we AFFIRM the judgment of the district court. In doing so, however, we are left puzzled by Binno’s failure to litigate against the LSAC, rather than the ABA. His amended complaint, filed in August 2011, followed by over four years the ruling in Love v. Law Sch. Admission Council, Inc., 513 F.Supp.2d 206, 223 (E.D. Pa. 2007), that the LSAC is “a covered entity under the [ADA],” and by over a decade similar litigation in Agranoff v. LSAC, Inc., 97 F.Supp.2d 86, 87 (D. Mass. 1999). Indeed, in Love, the LSAC conceded that it was subject to Title III. Love, 513 F.Supp.2d at 223. By contrast, we have been pointed to no cases in which a Title III or Title V claim has been brought against the ABA, successfully or otherwise.
In addition to other, prior litigation against the LSAC, there is now pending the ongoing administration of a nationwide consent decree in a class-action suit brought against the LSAC by the California Department of Fair Employment and Housing (DFEH) and joined by the United States Department of Justice (USDOJ). The original action sought damages and injunctive relief stemming from alleged failures of the LSAC to provide reasonable *349 accommodations to impaired test-takers of the LSAT, in violation of the ADA. See Dep’t of Fair Emp’t & Hous. v. Law Sch. Admissions Council, Inc., No. 12-cv-01830-JCS, 2015 WL 4719613 (N.D. Cal. Aug. 7, 2015); see also Dep’t of Fair Emp’t & Hous. v. Law Sch. Admission Council Inc., 896 F.Supp.2d 849 (N.D. Cal. 2012). In its most recent opinion, the district court considered and approved recommendations from a panel of five experts concerning how the LSAC should accommodate individuals with visual impairments in the “analytical reasoning section of the LSAT exam because of its reliance on visual-spatial abilities.” 2015 WL 4719613 at *12. Unless Binno is seeking to be relieved altogether of the obligation of taking the LSAT, a more practical approach to achieving admission to law school than years of fruitless litigation against a remote accrediting body might well be to take advantage of the consent decree that the DFEH and the USDOJ have entered with LSAC.

. As a technical matter, the actual accrediting agent is the Council of the ABA’s Section on Legal Education and Admission to the Bar, which, on matters of accreditation, maintains independence from its parent organization. Whether graduates of a non-ABA-approved school may be licensed to practice law in a given jurisdiction is a decision made by that jurisdiction's bar admission authority and not by the Council or the ABA.

. Law schools proposing a program inconsistent with an ABA Standard may apply for a variance from that standard under Standard 803. A law school seeking a variance bears the burden of demonstrating that the variance should be granted. An August 2009 ABA Consultant’s Memo notes five law school programs that successfully received variances from Standard 503. The Memo also indicates that the ABA has found one law school that does not use the LSAT to be compliant with Standard 503. According to recent news reports, several law schools are considering seeking authorization to substitute the Graduate Record Examination (GRE) for the LSAT. See, e.g., Karen Sloan, University of Arizona Law School’s Use of GRE Scores Creates LSAT Trouble, Nat’l L. L, May 2, 2016, available at http ://www.nationallawj ournal. com/id= 1202756501823/University-of-Arizona-Law-Schools-Use-of-GRE-Scores-Creates-LSAT-Trouble?slreturn=20160509101934; see also Sara Randazzo, LSAT’s Grip on Law-School Admissions Loosens, Wall St. J., Feb. 21, 2016, available at http://www.wsj.com/ articles/Isats-grip-op-Iaw-school-admissions-loosens-1455964203?cb=logged0. 08788420751644987. The GRE is an admissions requirement for most graduate schools in this country.

.A sample LSAT question attached as Exhibit B to the amended complaint does not "require” a diagram but merely suggests that ”[i]n answering some of the questions [in Section 1], it may be useful to draw a rough diagram.” Although the standard of review on motion to dismiss for lack of standing requires that the district court, as well as the reviewing court, accept the material allegations of the complaint as true, see Warth v. *343 SelcLin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the plaintiffs allegation that the ABA "forces” a blind applicant "to draw pictures as a condition of applying to law school” is an obvious exaggeration that we need not "construe in favor of the complaining party.” Id.

. The concurring opinion charges that Standard 503 has a "rigid requirement that law schools require each applicant to submit an LSAT score or else face sanctions or loss of accreditation.” However, the record indicates that sanctions are imposed only for "[s]ub-stantial or persistent noncompliance with one or more of the Standards” and may take a variety of forms, including a monetary penalty, private or public censure, probation, or "removal from the list of approved law schools.”

. Section 309 of Title III states: “Any [private entity] that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.” 42 U.S.C. § 12189.

. For example, the regulations implementing Section 309 discuss "alternative accessible arrangements” with respect to how the exam is administered. See, e.g., 28 C.F.R. § 36.309(b)(4) ("alternative accessible arrangements may include, for example, provision of examination at an individual’s home with a proctor").

. The relevant regulation states: "Any private entity offering an examination covered by this section must assure that [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual’s aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual’s impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).” 28 C.F.R. § 36.309(b)(1)©.

.The legislative history of Section 309 also supports the interpretation that an entity "offers" an exam if it can exert control over the administration, accessibility, or accommodation of that exam. That history indicates that Section 309 "was adopted to assure that persons with disabilities are not foreclosed from educational, professional, or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." H.R. Rep. No. 101-485(111), at 68-69 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 491-92 (emphasis added). The legislative histoiy also notes that "accessible to persons with disabilities ... includes physical access as well as accommodations in the way the test is administered, e.g. extended time or assistance of a reader.” Id. The purpose of the statute is to ensure that the exam is accessible to persons with disabilities in the exam's administration and accommodations.

. Section 503(b) of Title V provides, in relevant part: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter.” 42 U.S.C. § 12203(b) (emphasis added).